UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

SIMON PROPERTY GROUP, L.P.                                          PLAINTIFF


v.                                            CIVIL ACTION NO. 3:14-CV-00566-CRS


CASDNS, INC., *et al.*                                              DEFENDANTS


## MEMORANDUM OPINION

This matter is before the Court on two motions for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56: 1. the motion of Plaintiff Simon Property Group, L.P. (referred to variously as "SPG" or "Simon") (Pl. Mot. Summ. J., DN 122) and 2. the motion of Defendants CASDNS, Inc. ("CASDNS"), Cas-Com Internet Services, Inc. d/b/a BestRegistrar.com ("BestRegistrar"), and Jeffery S. Smith ("Smith") (Def. Mot. Summ. J., DN 123). CASDNS, BestRegistrar, and Smith are hereinafter "Smith Defendants" when referred to in the collective; CASDNS and BestRegistrar will collectively be referred to as "Corporate Defendants." The parties have responded and replied, accordingly. Defs.' Resp., DN 131 and Pl.'s Reply, DN 138; Pl.'s Resp. 130 and Defs.' Reply, DN 139. These matters are now ripe for adjudication. For the reasons that follow, both motions will be granted.

### I.     *Factual and Procedural Background*

SPG is a business entity that owns approximately 5,000 internet domain names. DN 24-1, PageID# 317. Defendants CASDNS and BestRegistrar are corporations that operate as "registrars" of internet domain names. Pl. Complaint, DN 1, PageID# 2; Defs.' Answer, DN 14, PageID# 186-87. Smith is the principal of both CASDNS and BestRegistrar. *Id.* In February 2000, SPG entered

1

into a business arrangement ("2000 Agreement") with CASDNS and Smith under which CASDNS and Smith agreed to provide registration services for SPG's domain names. Agreement Letter 2000, DN 1-3, PageID# 35. The 2000 Agreement was memorialized in an email from Smith to SPG:

> [CASDNS and Smith will] provide [SPG] with domestic . . . domain name registration services with the initial two year renewable subscription to be $45 [per domain name]. Renewals will be billed at the rate of $25 for a one year up to $20 for a ten (10) year subscription. There will be no registration fees charged. For International Domain Names, we propose a registration fee of $50 plus all applicable subscription fees . . ., taxes, bank and/or agent fees. . . For manual changes to names, contacts, names servers, a $10 fee will be charged. Automatic changes will not be charged for. In addition to the above rates a $5 charge will be incurred on a renewal basis for monitoring and bulk billing. . . . If there are additional needs, a reduced hourly rate of $75 will be used.

*Id.*

At some point, Smith Defendants also agreed to register "negative domain names"—variations of SPG's trademark and/or standard domain names with negative connotations—for SPG. Smith Depo. 1, DN 122-2, PageID# 985-86. These negative domain names were registered by Smith Defendants under an alias business name. *Id.* The ownership of the negative domain names is in dispute.

In 2002, the Kentucky Secretary of State administratively dissolved CASDNS and, from that time through May 2013, BestRegistrar and Smith provided domain name registration services to SPG in some capacity. DN 14, PageID# 203. From "roughly 2001 through 2014" Smith Defendants contracted with third party registrar COREhub S.R.L.U. ("COREhub") to perform domain name registration services, which included providing services for SPG. DN 122-2, PageID# 972.

2

Smith Defendants allege that, in May 2013, SPG renewed its agreement with BestRegistrar to register, maintain, represent, and renew SPG's "internet domain name portfolio" through December 31, 2014. DN 14, PageID# 204. Smith Defendants further allege that, in exchange for BestRegistrar's services, SPG agreed to pay in 2014 an "annual renewal fee of $227,297.12, payable in quarterly installments," and "a service fee for every time SPG requested changes to any domain names as a value added service." *Id.*

In mid-2013 SPG informed Smith Defendants that SPG wanted to move the management of some of its domain names to a different registrar. DN 123, PageID# 1033. At the time of SPG's request, all SPG domain names were protected by a "registrant" or "administrative" lock ("admin lock"),[1] which protected the owner and registrar of the domain name by limiting the access to the domain names. DN 131-1, PageID# 1238. Allegedly, SPG requested this lock to be put in place on all SPG domain names at the outset of the arrangement between SPG and Smith Defendants. *Id.*, PageID# 1237-38.

On September 10, 2013, a representative from SPG emailed Smith asking for an explanation of the charges in the bill that SPG had received for Smith transferring these domain names. DN 14-6, PageID# 247-48. Smith responded in part with the following:

> As you know, we charge a service fee . . . every time we touch a domain.
> Transferring a domain name out can take as many as 6 separate steps – For Example:
> 1) Provide Individual DNS Records – "Zone Export" ($12.50 DNS Charge – all names)
> 2) Unlock the domain – (Service charge – Usually $12.50)
> 3) Change/verify and send the Transfer Auth Code and mark in DB as Pending Transfer Out (Service Charge – Usually $12.50)

---

[1] The Court notes that the use of terms to describe various "locks" or "holds" throughout the record is inconsistent. To avoid confusion, the Court will refer to an "admin lock" as the lock placed on all domain names, allegedly at the request of SPG, to prevent outside actors from gaining access and a "registrar hold" as a hold placed on all domain names by Smith Defendants to prevent the domain names from being transferred due to SPG's alleged nonpayment.

> 4) Acknowledge Transfer of a domain (In these cases we did not acknowledge them, you guys did so no charge otherwise Services Charge – Usually $12.50)
> 5) Remove from Simon's DNS Servers ($12.50 DNS Charge – all names)
> 6) Updating the Database once the domain name has been transferred out (Service Charge – Usually $12.50)

*Id.*, PageID# 247. The remainder of Smith's response provided a breakdown of SPG's bill, alleged that BestRegistrar's rates were less than its competitors', and offered to further discuss any concerns with SPG. *See id.*

Early in 2014,[2] SPG informed BestRegistrar that it intended to transfer the service of all of its remaining domain names to a new domain name registrar. DN 29-6, PageID# 376. SPG demanded that Smith Defendants lift the admin lock from these domain names. *Id.* The admin locks were manually removed in "late July or early August 2014." DN 122-2, PageID# 979. SPG also asked Smith Defendants to provide the authorization ("auth") codes for its domain names. *Id.* These codes, which are required for a new registrar to be able access and transfer domain names from another registrar, were provided to SPG on July 22, 2014. DN 131-1, PageID# 1250-51.

At the time of SPG's request, SPG had paid Smith Defendants at least two of the four quarterly payments that SPG allegedly owed for 2014.[3] Shortly after SPG informed Smith Defendants that SPG wanted to transfer the service of all of its domain names to a new registrar, BestRegistrar placed SPG's domain names into a "registrar hold" status. DN 122-6, PageID# 1011. The registrar hold prevented the transfer of the domain name registrations to a new registrar. DN

---

[2] The exact date of when this request was first made is unclear. The parties both reference SPG's "formal" notification of transfer on May 20, 2014. DN 123-6, PageID# 1091. However, in an email dated March 21, 2014, SPG legal counsel refers to a previous phone call regarding SPG's "request to transfer the remaining domain names." DN 122-5, PageID# 1009-10. In any event, it is certain that Smith Defendants were apprised of SPG's intent to transfer in the first half of 2014.
[3] Whether SPG ultimately paid two or three such payments is uncertain from the evidence in the record, but this point is irrelevant to the instant motion.

122, PageID# 943. Smith Defendants indicated that they would not release this hold unless SPG paid Smith Defendants the remainder of the 2014 quarterly fees and other "various invoices." DN 122-6, PageID# 1011. On August 1, 2014, counsel for Smith Defendants sent a letter to SPG demanding a payment of $85,633.02 for "renewal" and "additional" services. DN 122-8, PageID# 1016. The letter stated that all SPG domain names serviced by Smith Defendants would be deleted "if payment is not received within seven (7) business days." *Id.*

Following Smith Defendants' demands for payment, SPG contacted COREhub for assistance. In July 2014, COREhub informed Smith Defendants that their actions were prohibited under the policies of the Internet Corporation for Assigned Names and Numbers ("ICANN"), the organization under which COREhub was an accredited registrar. DN 122-9, DN 1021. In its letter to Smith Defendants, COREhub cited to certain ICANN policy provisions as evidence that Smith Defendants were not justified in placing a registrar hold on SPG's domain names. DN 122-9, DN 1021. Upon SPG's petition to this Court in August 2014, Smith Defendants were enjoined from deleting SPG's domain names. DN 9. In late 2014, COREhub, not Smith Defendants, ultimately removed the registrar hold, allowing SPG to transfer the maintenance of its domain names to a new registrar, Corporation Service Company, Inc. ("CSC"). *See* DN 122, PageID# 945; DN 122-9, PageID# 1021-22.

## II.    *Procedural Background*

In light of the foregoing, SPG filed an action asserting eleven (11) claims against the Smith Defendants, Counts I-XI, in August 2014. DN 1. These claims arose from the following acts allegedly carried out by the Smith Defendants: 1) failure to provide a proper description of their transfer process; 2) failure to release and transfer of SPG's domain names; 3) demand for service fees which were "not then due and owing;" 4) threats to delete SPG's domain names; and, 5) failure

5

to comply with ICANN policies. DN 1, PageID# 9-10. The Smith Defendants filed an Answer and asserted Counterclaims against SPG for Breach of Contract and Unjust Enrichment/Quantum Meruit/Restitution. DN 14. Shortly thereafter, SPG filed a Motion to Dismiss the Smith Defendants' Counterclaim for Breach of Contract. Pl.'s Mot. Dismiss, DN 24. The Court granted that motion, dismissing the contract counterclaim for unenforceability under the Statute of Frauds. DNs 44, 45.

In April 2015, Smith notified the Court that he had filed for Chapter 7 Bankruptcy in the U.S. Bankruptcy Court for the Western District of Kentucky and asked that the Court either dismiss or stay the action. DN 41. Subsequently, all claims against Defendant Smith were stayed, pending the resolution of his bankruptcy. DN 46. The Court sought an update approximately a year later, in June 2016, when nothing more had been filed. SPG reported (1) that it believed that Smith's companies, CASDNS and Bestregistrar, were no longer operating, and (2) that, upon inquiry, it was informed that the bankruptcy Trustee had not yet determined whether he would undertake the then-pending counterclaims alleging breach of contract and unjust enrichment/quantum meruit on behalf of the bankruptcy estate. DN 49. On the same date, counsel for the companies and Smith moved to withdraw from representation in this case. DN 48.

Counsel for Smith Defendants was permitted to withdraw in September 2016. DN 52. The Magistrate Judge afforded the companies a period of time in which to hire new counsel and stayed the case until January 2017. *Id.* Smith was granted a discharge, and his bankruptcy case was closed on October 31, 2016. DN 59-1. The Court was not informed of this development until January 6, 2017 via status report from SPG. DN 59. In that report, SPG also noted that the Trustee "apparently saw no value in Mr. Smith's ownership interest in the Corporate Smith Defendants, or in trying to pursue the 'unjust enrichment' counterclaim" which remains pending in this case. *Id.*

6

Although tardy, Smith Defendants were permitted an extension of time and new counsel appeared in this case on January 19, 2017. DNs 57 and 60. The parties submitted an agreed scheduling order to the Magistrate Judge in February 2017. DN 63. This agreed order established, in pertinent part, a deadline of June 30, 2017 to seek amendment of pleadings and joinder of parties. *Id.* The deadline was subsequently extended without objection to July 14, 2017. DN 68. Smith Defendants timely filed a motion for leave to file amended counterclaims, crossclaims and third-party complaint on July 14, 2017. DN 69. SPG objected. DN 70. The Smith Defendants replied. DN 74.

As a result of the Smith Defendants' motion, the settlement conference which had been previously scheduled by the Magistrate Judge was remanded. DN 73. This Court then ordered a hearing and noticed the bankruptcy Trustee for the Smith bankruptcy, the U.S. Trustee, and Smith's bankruptcy counsel, in addition to the parties and counsel in this case. DN 75. The Court posed a number of questions concerning the ownership of the newly asserted and expanded claims which the Smith Defendants sought to file in this case. *Id.* The Court noted that despite these claims having arisen before the filing of the bankruptcy petition, they were not listed by Smith as contingent claims. *Id.* The Court inquired concerning the ownership of the claims, whether the claims properly should be included in the bankruptcy, and whether the Trustee intended to reopen and pursue these claims on behalf of the bankruptcy estate. *Id.*

Without any satisfactory answer provided at the hearing, the Court administratively remanded the motion for leave to amend in March 2018, pending further information and a decision from the Trustee concerning pursuit of the proposed claims. DN 77. Some time passed with no information forthcoming. In December 2018, the Trustee filed a report with the Court indicating that "[t]he bankruptcy estate has zero funds and is not in a position to retain and pay

7

counsel to pursue these causes of action. Therefore, the Trustee will be refiling a No Distribution Report ("NDR") with the Bankruptcy Court effectively abandoning the estate's interest in the causes of action before this Honorable Court. Upon the filing of the NDR, Mr. Smith will control the claims." DN 88, PageID# 785.

Eleven months after the Trustee filed his report with the Court, Smith Defendants renewed their motion for leave to file amended counterclaims, crossclaims, and third-party complaint. DN 89. SPG responded, raising virtually identical objections to the renewed motion to amend as it had earlier asserted. DN 90. Ultimately, Smith Defendants were permitted to assert an amended counterclaim against SPG for Unjust Enrichment/Quantum Meruit/Restitution (DN 93) and this claim was filed in March 2020 (DN 97). SPG moved to dismiss the counterclaim. DN 94. The motion was denied but this Court imposed sanctions on Smith Defendants for failure to timely comply with a court order. DN 99.

In August 2021, SPG stipulated to dismiss five of the eleven counts (Counts VI, VII, VIII, X, and XI) in its original complaint (DN 1). DN 129. Smith Defendants have moved for summary judgment on all remaining claims asserted by SPG (i.e., those claims in Counts I, II, III, IV, V, and IX of SPG's complaint, DN 1). DN 123. SPG has moved for summary judgment on Smith Defendants' counterclaim of Unjust Enrichment/Quantum Meruit/Restitution. DN 122.

## III.    Effect of Bankruptcy

The Court recognizes that the parties continue to use the designation "Smith Defendants" to refer to Smith and the Corporate Defendants, collectively. However, the claims against Smith as an individual were discharged via his bankruptcy proceedings.[4] Thus, SPG may only seek to

---

[4] *See* Smith Bankruptcy Petition, Bankr. W.D. Ky., Case No. 15-30887, Doc. 1, p. 29 (listing Simon Property Group as a creditor with an unsecured claim of $500,000); Discharge of Debtor, Bankr. W.D. Ky., Case No. 15-30887, Doc. 15, p. 1 (granting Smith a discharge).

8

recover from Corporate Defendants. To make matters more confusing, because Smith's bankruptcy Trustee declined to include Smith Defendants' claims against SPG as part of Smith's bankruptcy estate,[5] it appears that Smith is still a party to the counterclaim against SPG. For purposes of consistency, the Court will refer to the defendants in this case as "Smith Defendants," with the understanding that Smith has no personal liability and, thus, it may be necessary at times to delineate Smith as individual from the Corporate Defendants.

## IV.    Legal Standard

Summary judgment is appropriate when the moving party shows that, for each claim or defense on which judgment is sought, there exists "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party may show the absence of any genuine issue of material fact by "demonstrating that the nonmoving party lacks evidence to support an essential element of its case." *Ford v. GMC*, 305 F.3d 545, 551 (6th Cir. 2002). A fact is "material" if its resolution might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that negate an essential element of the nonmoving party's claim. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. 317 at 322.

If the moving party makes this showing, "the burden . . . shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. DOT*, 53 F.3d 146, 150 (6th Cir. 1995). The nonmoving party "must do more than show that there

---

[5] *See* Trustee Status Report, DN 88, PageID# 785.

is some metaphysical doubt as to the material facts." *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). Rather, to overcome a motion for summary judgment, the nonmoving party must produce "significant probative evidence." *See Moore*, 8 F.3d 335, 339-40 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). The court must view the evidence in the light most favorable to the non-moving party and grant a motion for summary judgment only "if the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the nonmoving party." *Cox*, 53 F.3d 146, 150 (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989)).

## V.   SPG's Motion for Summary Judgment on Counterclaim of Unjust Enrichment/Quantum Meruit/Restitution.

Smith Defendants' counterclaim against SPG arises out of SPG's alleged failure to pay Smith Defendants the "amounts owed for performing various internet domain name registration services." DN 97, PageID# 857. According to Smith Defendants, "CASDNS, BestRegistrar, and Smith invested a substantial amount of money and time in providing internet domain name registration, modifications, renewals, transfers and value added services to SPG's approximately five-thousand (5,000) internet domain names" and "Smith invested a substantial amount of money and time in formulating and maintaining . . . negative domain names" for SPG's benefit. DN 97, PageID# 863. Smith Defendants claim that "[t]o date, CASDNS, BestRegistrar and Smith have not received any reimbursement, compensation or consideration from SPG for the previous services rendered" and "Smith has not received any reimbursement, compensation or consideration from SPG for the transfer in ownership of the negative domain names." *Id.* As a result, Smith

Defendants maintain that they "suffered monetary damages . . . and are therefore entitled to compensation from SPG." *Id.*, PageID# 864.

### A.  *Quantum Meruit vs. Unjust Enrichment*

Though Smith Defendants claim and argue their equitable causes of action together, quantum meruit and unjust enrichment are distinct theories of recovery in Kentucky. *See Isaacs v. Lawson*, 2012 Ky. App. Unpub. LEXIS 776, at *12-*13 (Ky. Ct. App. Oct. 26, 2012) (distinguishing the two theories of recovery) (citing *JP White, LLC v. Poe Cos., LLC*, Nos. 2010-CA-000267-MR, 2010-CA-000299-MR, 2011 Ky. App. Unpub. LEXIS 392, at *11-*13 (Ct. App. May 6, 2011); *see also MidAmerican Distrib., Inc. v. Clarification Tech., Inc.*, 807 F. Supp. 2d 646, 680 (E.D. Ky. 2011) (analyzing unjust enrichment and quantum meruit as independent theories of recovery, but acknowledging that some cases "appea[r] to conflate the two theories"). To prove a claim based on quantum meruit, a plaintiff must show:

1. that valuable services were rendered, or materials furnished;
2. to the person from whom recovery is sought;
3. which services were accepted by that person, or at least were received by that person, or were rendered with the knowledge and consent of that person; and
4. under such circumstances as reasonably notified the person that the plaintiff expected to be paid by that person.

*Quadrille Bus. Sys. v. Ky. Cattlemen's Ass'n*, 242 S.W.3d 359, 366 (Ky. Ct. App. 2007) (quoting 66 Am.Jur.2d *Restitution and Implied Contracts* §38 (2001)). To prevail under a theory of unjust enrichment, a plaintiff must demonstrate:

1. benefit conferred upon defendant at plaintiff's expense;
2. a resulting appreciation of benefit by defendant; and
3. inequitable retention of benefit without payment for its value

*Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009) (citation omitted).

As such, the primary difference between the two theories is that quantum meruit allows for the recovery of damages based on the value of the services rendered rather than on the value of the benefit to the recipient party. *See JP White,* 2011 Ky. App. Unpub. LEXIS 392, at *12 ("[I]t has been recognized that recovery under quantum meruit does not depend upon the conferment or retention of a benefit, as such is not absolutely necessary for recovery," but "unjust enrichment is a distinct theory of restitutionary relief wherein damages are based directly upon the benefit conferred and retained.").

Smith Defendants argue that they were not paid for multiple valuable services rendered for the benefit of SPG, including "annual registration fees due and owing for 2014" and "portfolio domain name value added service[s]." DN 131, PageID# 1220-21. Additionally, Smith Defendants claim that they were never compensated for "formulat[ing] and register[ing] . . . hundreds [of] negative domain names" on behalf of SPG. *Id.*, PageID# 1223. Smith Defendants maintain that Smith was the owner of these negative domain names and that there was an "express understanding" that Smith would be compensated if SPG ever wanted to take ownership of these negative domain names. *Id.*, PageID# 1227 (citing to DN 131-1, PageID# 1262-63). According to Smith Defendants, ownership of the negative domain names was transferred to SPG "without [Smith Defendants'] permission and without payment." *Id.*, PageID# 1221.

The Court will address each of these claims in turn.

### 1.  *"Annual registration fees due and owing for 2014"*

Smith Defendants contend that SPG owes payment for "previously rendered domain name registration services." [6] DN 97, PageID# 860. According to Smith Defendants, by the time SPG

---

[6] The record contains conflicting statements as to the number of quarterly payments that SPG tendered to Smith Defendants for registration services. In the instant motion both parties seem to agree that SPG paid two of the four payments for a total of $113,648.56. DN 122, PageID# 942 (stating that "it is undisputed that SPG paid the Smith Defendants" two quarterly payments of $56,824.28 in 2014); DN 131, PageID# 1216 (asserting that SPG "got the

made its request in 2014 to transfer all of its remaining domain names to CSC, Smith Defendants had already paid all the registration and renewal fees that SPG owed for all of 2014 (and even some from 2015). DN 131, PageID# 1216 (citing Smith Depo. 1, DN 131-1, PageID# 1267-68 and Smith Depo. 2, DN 131-2, PageID# 1284). Smith Defendants argue that they were not fully compensated for these services. DN 131, PageID# 1222. For the reasons discussed below, the Court finds that Smith Defendants have not shown there is a genuine issue of material fact as to whether they are entitled to recover from SPG "annual registration fees due and owing for 2014."

The Court first notes that the excerpts from Smith's testimony cited by Smith Defendants do not offer much clarity as to how much money Smith Defendants actually paid COREhub on behalf of SPG in 2014. For example, at one point Smith stated, "we paid everything,"[7] but he later indicated that COREhub continued to bill BestRegistrar for the registration fees and "at some point we stopped paying."[8] Equally uninformative is Smith's attempt to explain how Smith Defendants applied the payments that SPG tendered in 2014:

> There's two ways that you're a registrar. You can either be a portfolio registrar which means you get a group of names and you pay a price for or you do them individually. And depending on which type of customer you are is how you are charged and how it is kind of what the rules apply to. And that's back to the administrative locks and everything of the sort. It was definitely without dispute I believe that Simon was a portfolio domain name holder because we gave them a list of all their domain names once a year said these are expiring in the next year and here's a flat rate to renew. Okay. So, you know, it's, you can guess, you know, you can say they're 47 dollars apiece or 47 dollars and 41 cents, but no, some of them are 18 hundred dollars apiece, you know. So and that's where it gets really complicated. So it kind of doesn't matter at that point whether they expired in March or December. They paid for two thousand. You know, they were changed. We went into 2014.

---

services, they got the domain names for that year . . . [t]hey only paid for half.") (quoting Smith Depo. 1, PageID# 1281) (internal quotation marks omitted). However, elsewhere in the record Smith Defendants admit that "SPG made three out of four installment payments of the total 2014 renewal fee." DN 29, PageID# 349.

[7] DN 131-1, PageID# 1266.

[8] DN 131-1, PageID# 1267.

> They paid two of the four invoices and the other three and four didn't
> get paid. And at that point it should be a non-issue whether or not
> what each individual one cost during that time. It's just they didn't
> fulfill the four payments. And but they did receive the benefit. They
> didn't pay anybody else those four payments.

DN 131-1, PageID# 1269.

To the degree that Smith's deposition testimony suggests that Smith Defendants paid COREhub for all of SPG's registration fees in 2014, SPG has put evidence into the record that directly brings this claim into question. In a sworn affidavit, SPG's corporate representative stated that, after the transfer, SPG still had to pay CSC—SPG's new registrar—$90,840 to renew 5,096 domain names in 2014, including $38,648 to prevent the lapse of 2,203 domain name registrations between July and December of 2014. Flanagan Depo., DN 138-1, PageID# 1318. Smith Defendants do not dispute this evidence and when asked in deposition if there was a ledger or other documentation of the account history between BestRegistrar and COREhub that might show which registration fees were paid for SPG in 2014, Smith replied, "I mean there's invoices and stuff, but again they're real cryptic. You don't know what belongs to who." DN 131-1, PageID# 1268.

SPG has also correctly pointed to certain "internal inconsistencies" in Smith Defendants' argument. Specifically, Smith Defendants assert in their briefing that "[a]t the time of Simon's transfer request in 2014, the Smith Defendants had paid all renewal fees for that year," while simultaneously claiming, "the Smith Defendants continued to be charged [by COREhub] for Simons' renewals throughout 2014 and thereafter." DN 131, PageID# 1216 (citing DN 131-1, PageID# 1266-68; DN 131-2, PageID# 1284). It is unclear why COREhub would continue to charge Smith Defendants for the remainder of 2014 if Smith Defendants had already paid the entirety of SPG's 2014 renewal fees.

14

There is additional evidence in the record suggesting that Smith Defendants did not, in fact, pay SPG's registrations up through the end of 2014. First, in an email dated March 26, 2014, Smith informed an SPG employee that "for Simon's domain names to be renewed through [the end of the year], the renewals need to be paid in full. . . . There are two payment [sic] remaining in order for us to complete these renewals." DN 123-5, PageID# 1086. Second, Smith acknowledged in his deposition that he received monthly invoices from COREhub which would "fluctuate depending on how many domain names were registered" or renewed that month for SPG. DN 138-2, PageID# 1329. Finally, Smith is on record stating that, while he "had the option" to pay all of SPG's renewals up through December 31, he did not think that he "took that option." DN 138-2, PageID# 1331.

In sum, Smith Defendants have failed to show that a genuine issue of material facts exists as to whether Smith Defendants paid all of SPG's renewal fees for 2014. Therefore, Smith Defendants' quantum meruit and unjust enrichment claims based on "[a]nnual registration fees due and owing for 2014" cannot survive summary judgment.

### 2. *"Portfolio domain name value added service fees"*

Smith Defendants next allege that they are entitled to recover for their performance of "portfolio domain name value added service[s]." Specifically, Smith Defendants claim that they conferred a benefit upon SPG by "extract[ing] and provid[ing] the auth codes necessary for the transfer of Smith's entire portfolio of domain names to its newly chosen registrar" and "manually remov[ing] the registrant or owner lock or hold from each of the domain names in Simon's portfolio." DN 131, PageID# 1222-23. Smith testified that these services were of value to SPG because SPG used the auth codes and "had to have them in order to transfer the names." DN 131-1, PageID# 1252. Smith also indicated that the removal of the "admin lock" benefited SPG

15

"because it needed to be removed no matter what if they intended on ever moving these domain names." DN 131-2, PageID# 1287.

As previously discussed, unjust enrichment occurs when one party confers a benefit on a second party and the second party unfairly retains the benefit of this service. On the other hand, a claim in quantum meruit requires only that the party seeking recovery show that he performed a service for the benefit of a second party with that second party's knowledge and consent. Thus, under quantum meruit, even if the second party does not accept or realize the benefit of the service, the party who performed the service can recover "reasonable compensation" for the service so long as the second party had knowledge that this service was being performed and that compensation was expected. Here, SPG insists that Smith Defendants cannot recover under either of these theories, but for different reasons.

First, SPG argues that recovery under unjust enrichment is precluded because the purported "valuable services" performed by Smith Defendants did not benefit SPG. DN 138, PageID# 1311. While SPG acknowledges that Smith Defendants provided the auth codes upon SPG's request, SPG claims these codes "were worthless and never used" because of the additional locks/holds on that Smith Defendants had on the domain names. *Id.* SPG notes that it, ultimately, had to contact COREhub directly to have the domain names unlocked and to "override the need for auth codes." *Id.*, PageID# 1311-12. In a sworn declaration, SPG's corporate representative stated, "[Smith] Defendants did not assist in any way, shape or form with [the] transfer [to CSC]. To the contrary, [they] obstructed the transfer for several months." DN 138-1, PageID# 1317. Smith admitted in his deposition that SPG was unable to realize the benefit of the auth codes or removal of the admin lock due to the imposition of the registrar hold. DN 122-2, PageID# 978-79 (acknowledging that, even after paying for the auth codes and removal of the admin lock, SPG would have been

16

prevented from transferring the domain names because of the registrar hold). For these reasons, the Court finds that SPG has evidenced that Smith Defendants cannot substantiate an essential element of their claim of unjust enrichment for "portfolio domain name value added services" and SPG is entitled to judgment as a matter of law on this issue.

Second, SPG maintains that Smith Defendants' quantum meruit claim fails because Smith Defendants did not obtain SPG's consent before performing the purported "valuable services" for which Smith Defendants seek to recover and that SPG did not agree to pay for such services. DN 122, PageID# 950-53. In fact, SPG claims that Smith Defendants are trying to recover for services performed "over SPG's explicit objections" "months *after* SPG requested Defendants transfer all of its domain names to another registrar." *Id.*, PageID# 951 (emphasis in original). According to SPG, none of "the . . . 'services' allegedly provided after Defendants implemented the registrar hold on May 26, 2014" could have been performed with SPG's consent. *Id.*, PageID# 952.

The record shows that on July 17, 2014, Smith informed SPG via email of the charges that would be incurred should SPG decide to have Smith remove the admin lock and provide auth codes for all SPG domain names. DN 123-6, PageID# 1093. Smith also explained that SPG could avoid these fees by choosing to have SPG's own employees obtain the auth codes and remove the admin lock. *Id.* The following day SPG responded, instructing Smith to "[p]lease provide a report of all listed domain names with the authorization codes today" and "please unlock any domain names which are currently locked." DN 123-9, PageID# 1112. Smith reminded SPG once again that SPG could remove the lock without Smith's involvement, free of charge. *Id.*, PageID# 1111. SPG directed Smith to "[p]lease proceed to provide a report of all listed domain names with the authorization codes." *Id.*, PageID# 1110. On July 21, 2014, Smith provided SPG with the requested

information along with "Invoices and a Statement of Account to show what is needed to bring [SPG's] account to current." *Id.*

The above evidence demonstrates that SPG consented to Smith Defendants' performance of some "value added" services, even if the extent and details of the agreement between the parties is not obvious from the record.[9] Therefore, Smith seems to have performed certain services with SPG's knowledge. Nevertheless, SPG was not able to realize the benefit of these services because Smith Defendants had placed a registrar hold on the domain names. Smith Defendants maintain that the registrar hold was justified and permissible under ICANN policy because SPG had not paid for "previous and current registration periods." DN 131, PageID# 1231.[10] However, ICANN policy aside, this Court has already determined that Smith Defendants have not evidenced that SPG was indebted to Smith Defendants for fees from any registration period in 2014. As such, Smith Defendants have not shown that they were justified in placing a registrar hold on SPG's domain names. On these grounds, SPG argues that Smith Defendants have "unclean hands" and are not entitled to equitable relief for providing the auth codes or removing the admin lock. DN 122, PageID# 957. The Court agrees.

The doctrine of unclean hands

---

[9] The scope of the work agreed upon by the parties is unclear. In Smith's July 17 email he informed SPG that the cost for providing a report of domain names with auth codes would be $500 and "for the charge of $12.50 per domain name" (excluding foreign domain names) that Smith would "update the Owner, Admin, Billing and technical Contacts, unlock the domain, update the name servers, and set an Auth Code of Simon's choosing." DN 123-6, PageID# 1093. However, the total number of domain names that would incur a $12.50 charge is not stated. Further, it does not appear from SPG's response that SPG agreed to all of the work Smith offered to perform for $12.50 per domain name. *See* DN 123-9, PageID# 1112 (indicating that SPG's understanding of the agreed work was for Smith to provide the report of domain names with auth codes for a cost of "no more than $500"). Smith's final invoices for "service fees for Admin hold" and "providing Auth Codes" are each $87,100. DN 122-10 and DN 122-11. Smith does not explain how he arrived at these figures.

[10] Registrar holds are allowed under ICANN policy only in limited circumstances for nonpayment: 1. the domain name is past its expiration date and the domain name owner has not paid "for [a] previous registration period" or 2. the domain name has not expired, and the domain name owner has not paid for "previous or current registration periods." ICANN Transfer Policy, DN 29-9, PageID# 388. However, transfer of a domain name cannot be denied for "[n]onpayment for a pending or future registration period." *Id.*, PageID# 389.

assumes that the suitor asking the aid of a court of equity has himself
been guilty of conduct in violation of the fundamental conceptions
of equity jurisprudence, and therefore refuses him all recognition
and relief with reference to the subject-matter or transaction in
question. It says that whenever a party, who, as actor, seeks to set
the judicial machinery in motion and obtain some remedy, has
violated conscience, or good faith, or other equitable principle, in
his prior conduct, then the doors of the court will be shut against him
in limine; the court will refuse to interfere on his behalf, to
acknowledge his right, or to award him any remedy.

*Barrowman Coal Corp. v. Kentland Coal & Coke Co.*, 196 S.W.2d 428, 433 (1946) (citation

omitted). Here, Smith Defendants seek payment for services they allegedly performed for the

benefit of SPG, even though Smith Defendants' own conduct appears to have prevented SPG from

realizing this benefit. SPG has, thus, evidenced that Smith Defendants do not come to the Court

with clean hands. Accordingly, the Court declines to recognize Smith Defendants' right to remedy

for "portfolio domain name value added services" under a theory of quantum meruit.[11]

### 3. *Negative Domain Names*

Smith Defendants claim that they are owed compensation "for their work in formulating

and registering negative domain names at the request of and for the benefit of Simon." DN 131,

PageID# 1221. Smith testified that, pursuant to an oral agreement with SPG, Smith "made a list"

of potential negative domain names, sent that list to SPG, SPG instructed Smith as to which

negative domain names to register, and Smith set them up in the name of a business alias owned

by Smith. DN 131-1, PageID# 1258. Smith stated that SPG only paid the registration renewals for

---

[11] Smith Defendants seek safe harbor on the basis that they acted in "good faith" when placing the registrar hold on the domain names for SPG's alleged nonpayment. DN 131, PageID# 1231. As evidence, Smith Defendants state that they consulted with COREhub prior to imposing the registrar hold and COREhub agreed that the hold would be compliant with ICANN policy. *Id.*, PageID# 1231-32. However, COREhub's evaluation of Smith Defendants' position directly correlates to the information Smith Defendants provided to COREhub regarding SPG's payment status and does not speak to the veracity of this information. Therefore, Smith Defendants cannot use COREhub's opinion as evidence that the registrar hold was imposed in good faith.

the negative domain names and Smith Defendants were never reimbursed for the "salary," "time," or "effort" spent in developing and registering the negative domain names. *Id.*, PageID# 1258-59.

Regardless of any purported agreement between the parties for Smith to formulate and register negative domain names on behalf of SPG, Smith Defendants have not shown that they are entitled to an equitable resolution. While Smith testified that Smith Defendants were not compensated for these services when they were performed some twenty years ago,[12] Smith Defendants have offered no evidence showing the cost Smith Defendants incurred for performing these services or the unpaid benefit that SPG allegedly received as a result.

Smith also testified that under the agreement with SPG Smith was the owner of the negative domain names and, if at any time SPG wanted to take ownership of the negative domain names, SPG would "reimburse [Smith] what [the negative domain names] were worth." *Id.*, PageID# 1262. Smith alleges that ownership of the negative domain names was "transferred [to SPG] without [Smith Defendants'] permission and without payment." DN 131, PageID# 1221.

Assuming that Smith was the owner of the negative domain names—a claim that Smith Defendants have not substantiated—the record lacks the requisite evidence for Smith Defendants to recover in equity for the "taking" of these names. Smith Defendants claim that "the negative domain names have an intrinsic value of [sic] in excess of $175,000.00 or more." DN 97, PageID# 862. While Smith Defendants have offered no explanation as to how they arrived at this number, it appears to be related to the profit that Smith Defendants were earning from managing the negative domain names. *See* DN 138-2, PageID# 1324 (acknowledging that BestRegistrar "made a profit from Simon Property Group in maintaining these negative domain names in trust for Simon" and that this "proves the value of the domain names").

---

[12] *See* DN 138-2, PageID# 1323 (stating that BestRegistrar or Smith paid a fee to acquire the negative domain names "20 something years ago").

The "intrinsic value" of the negative domain names to Smith Defendants, however, is not the appropriate measure of value for equitable recovery. To prevail on a claim of unjust enrichment, Smith Defendants must evidence that SPG realized some value or benefit by acquiring ownership of the negative domain names. Smith Defendants have made no such showing, but merely argue that the value of the domain names to SPG is self-evident because, just as with all of SPG's other domain names, SPG requested that the negative domain names be transferred to the new registrar. DN 131, PageID# 1223. Yet, that SPG sought to move the negative domain name registration services to a new registrar does not evidence that SPG realized an unjust economic benefit from owning the negative domain names.

While it is possible that Smith Defendants could recover "the reasonable market value" of the negative domain names under a theory of quantum meruit,[13] Smith Defendants offer no evidence of the "value" these negative domain names would have in the marketplace. In fact, Smith testified that the parties did not agree upon any formula or methodology for calculating the value of these domain names. DN 138-2, PageID# 1326. Thus, Smith Defendants have provided no basis for a reasonable trier of fact to conclude that they are entitled to equitable recovery based on Smith's ownership rights in the negative domain names.

For all of the reasons stated above, the Court will grant SPG's motion for summary judgment on Smith Defendants' claims of unjust enrichment and quantum meruit.

## VI.   Smith Defendants' Motion for Summary Judgment on All Outstanding Claims

Smith Defendants move for summary judgment on all claims asserted against them by SPG. DN 123. SPG voluntarily dismissed five of the original eleven counts against Smith

---

[13] *See Lofton v. Fairmont Specialty Ins. Managers, Inc.*, 367 S.W.3d 593, 597 (Ky. 2012) ("Quantum meruit is an equitable remedy invoked to compensate for an unjust act, whether it is harm done to a person after services are rendered, or a benefit is conferred without proper reimbursement. It, therefore, entitles the one who was harmed to be reimbursed the reasonable market value of the services or benefit conferred.") (citation omitted).

Defendants in August 2015. DN 126. Thus, only Counts I-V and Count IX remain outstanding against Smith Defendants. The merits of and the corresponding arguments against each claim will be assessed below.

### A. *Count I: Breach of Contract*

The parties agree that they were contractually bound by the 2000 Agreement. DN 1, PageID# 11; DN 139, PageID# 1337. The 2000 Agreement did not provide a definite length of the contract term and did not state that SPG would incur any fees in the event that SPG chose to cancel or terminate the contract or transfer domain names to a different registrar. *See* DN 1-3. However, the 2000 Agreement did provide that, in addition to the annual fee for renewing domain name registrations, Smith Defendants would charge $10 for "manual changes to names, contacts, [and] names servers," $5 for "monitoring and bulk billing," and at an hourly rate of $75 for "additional needs." *Id.*

According to SPG, Smith Defendants breached the 2000 Agreement on multiple occasions. First, SPG asserts that "the amounts [Smith Defendants] demanded from SPG over the years did not accord with the February 1, 2000 Agreement." DN 130, PageID# 1145. This argument is without merit. Smith Defendants maintain, and SPG does not dispute, that each year the terms of the 2000 Agreement would be "revisited and modified," as SPG "acquired additional domain names and requested additional services." DN 139, PageID# 1337. The parties agree that, as part of this process, Smith Defendants would send an email with an estimate of the total cost of all renewals for the following calendar year, which SPG would pay in four equal quarterly payments throughout the next calendar year. DN 122, PageID# 941. Documentation of two such estimates

are in the record, one projecting the total cost for 2011 and the other projecting the total cost for 2013. DN 123-2, PageID# 1062, 1066-70.[14]

Increases in the total for renewals each year does not evidence a breach of the 2000 Agreement. In the two annual estimates provided as examples, Smith Defendants explain the reasons for any increase in cost over the previous year. *See id.* One of the projections was dated from June 2010 and the other from September 2012, indicating that SPG had ample time to assess the updated charges before the end of the calendar year. *Id.* SPG assented to the estimated total— including any increase in cost from the previous year—by choosing to make quarterly payments. Thus, SPG has no basis for claiming that Smith Defendants breached the 2000 Agreement by increasing the annual cost to SPG.

SPG also alleges that "[Smith] Defendants had no authority under the contract to lock SPG into a continual relationship against SPG's will" by applying "a registrar lock on all [of SPG's domain names] to prevent their transfer" and that "[Smith] Defendants charged exorbitant fees in order to transfer each of" SPG's domain names, which was not "disclosed or accounted for" in the 2000 Agreement. DN 130, PageID# 1146. The Court first notes that SPG has provided no evidence that would allow a trier of fact to conclude that the transfer fees charged by Smith Defendants were "exorbitant." Additionally, the 2000 Agreement and all subsequent iterations thereof, are silent on the actions that Smith Defendants would be entitled to take in the case of nonpayment and the fees that SPG would incur should it decide to transfer the domain names to a different registrar. In other words, SPG has not evidenced that these issues were contemplated by the parties or were included as terms of the 2000 Agreement. It follows then, that SPG cannot maintain the position that placing

---

[14] There is no such documentation provided for the projected total cost for 2014.

a registrar hold on the domain names and charging fees to transfer the domain names "breached" the 2000 Agreement.[15]

### B. Count II: Violation of Anticybersquatting Consumer Protection Act ("ACPA")

SPG seeks to recover against Smith Defendants under the ACPA, which prohibits an individual from "register[ing], traffic[king] in, or us[ing] a domain name" that is "identical or confusingly similar to" a "distinctive" mark or that is "identical or confusingly similar to or dilutive of" a "famous" mark. 15 U.S.C. § 1125(d)(1)(A). Here, SPG alleges that the domain names that were managed by Smith Defendants "contain SPG's marks and trade names commonly used to identify SPG and its Real Estate Holdings." DN 130, PageID# 1151. As such, SPG maintains that Smith Defendants "sought to improperly traffic" in the domain names by refusing to lift the registrar lock until SPG paid the registration and transfer fees Smith Defendants claimed they were owed. *Id.*, PageID# 1152.

The ACPA allows a plaintiff to assert a private cause of action for "cybersquatting," which occurs when "a person other than a trademark holder registers a domain name of a well-known trademark and then attempts to profit by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder." *Honorable Order v. Ky. Colonels Int'l*, Civil Action No. 3:20-cv-132-RGJ, 2020 U.S. Dist. LEXIS 258978, at *12 (W.D. Ky. Aug. 12, 2020). The ACPA was enacted to stop "the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark." *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 810 (6th Cir. 2004). *See also Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 549 (6th Cir. 2003)

---

[15] SPG references Smith Defendants' violation of ICANN Transfer Policy to support the breach of contract claim. As SPG provides no argument for why an ICANN policy should be considered a binding contractual term under which SPG can recover damages, the Court will not consider ICANN policies in the analysis of SPG's breach of contract claim.

("Registering a famous trademark as a domain name and then offering it for sale to the trademark owner is exactly the wrong Congress intended to remedy when it passed the ACPA."). Under the ACPA, a person "traffics in" a domain name if he conducts "sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration." 15 U.S.C. § 1125(d)(1)(E).

Smith Defendants had no ownership rights in the domain names and the domain names were registered in SPG's name.[16] By placing a registrar hold on the domain name registrations, Smith Defendants prevented SPG from changing registration service companies until payment was received. Thus, if anything, Smith Defendants "trafficked" in domain name registration management, not in the domain names themselves. Because SPG cites no authority to support the assertion that this conduct constituted the type of "trafficking" contemplated by the APCA, the Court declines to interpret it as such.[17] SPG has, therefore, failed to evidence an essential element of this claim and Smith Defendants are entitled to summary judgment.

### C. Count III: Conversion

SPG claims that, by maintaining possession of the domain names to the exclusion of SPG prior to the names being transferred to CSC, Smith Defendants committed conversion. DN 130, PageID# 1154. The Court first observes that "Kentucky courts have not addressed whether

---

[16] If Smith personally owned the negative domain names, as Smith Defendants claim (DN 97, PageID# 860), the APCA claim as it applies to the negative domain names was discharged by Smith's personal bankruptcy proceedings.

[17] To the extent that SPG relies on *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213 (9th Cir. 2010), this reliance is misplaced. The domain name at issue in DSPT was registered in the defendant's name and the defendant refused to transfer the registration to his former employer until the former employer compensated him for certain commissions that he believed he was owed. 624 F.3d at 1217. The Ninth Circuit described the defendant's conduct as holding the domain name for "ransom." *Id.* at 1224. In the instant case, all domain name ownership rights and registrations rested with SPG, not Smith Defendants. Thus, the Court is not persuaded by *DSPT*. The facts of the present case are also dissimilar to *Acad. of Motion Pictures Arts & Scis. v. Godaddy.com, Inc.*, No. CV 10-3738 ABC (CWx), 2013 U.S. Dist. LEXIS 198592, at *20 (C.D. Cal. June 21, 2013), where the court found the domain name registrar to be a licensee of the registrant when the registrar placed revenue-generating ads on the registrant's website.

25

conversion applies to intangible property," such as domain names. *J & J Sports Prods. v. Jaschkowitz*, No. 5:14-CV-440-REW, 2016 U.S. Dist. LEXIS 60326, at *38 (E.D. Ky. May 6, 2016). Insofar as SPG's conversion claim is legally proper under Kentucky law, SPG has not provided the evidence necessary for the claim to be actionable.

A successful conversion claim requires proof that:

> (1) the plaintiff had legal title to the converted property; (2) the plaintiff had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment; (4) the defendant intended to interfere with the plaintiff's possession; (5) the plaintiff made some demand for the property's return which the defendant refused; (6) the defendant's act was the legal cause of the plaintiff's loss of the property; and (7) the plaintiff suffered damage by the loss of the property.

*Ky. Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 n. 12 (Ky. 2005) (quoting 90 Corpus Juris Secundum (C.J.S.) Trover and Conversion § 4 (2004)).

The Court finds no evidence to support SPG's contention that Smith Defendants "exercised dominion" over the domain names while the registrar hold was in place. While Kentucky courts have not expounded on the meaning of "dominion" in the context of a conversion claim, Black's Law Dictionary defines "dominion" as: "[P]erfect control in right of ownership. The word implies both title and possession and appears to require a complete retention of control over disposition. Title to an article of property which arises from the power of disposition and the right of claiming it." *Dominion*, <u>Black's Law Dictionary</u> (5th ed. 1979) (internal citation omitted).

SPG never lost title to the domain names and SPG cites no authority to support the assertion that, as registrar, Smith Defendants "possessed" the domain names. DN 130, PageID# 1154. In the briefing, SPG describes the relationship between a domain name owner and a registrar as an

arrangement in which the registrar is responsible for "ensur[ing] that [the owner's] domain names are linked properly to the IP Addresses for [the owner's] websites." DN 122, PageID# 938. There is no evidence that this arrangement conveys lawful "possession" of the domain names to the registrar. Likewise, a "registrar hold" does not interfere with the domain name owner's ownership or possessory rights in the domain names or its ability to transfer those rights. Such a hold only affects the owner's ability to transfer the management of its domain name registrations to a different registrar. As such, SPG has not shown that Smith Defendants "exercised dominion" over the domain names by imposing a registrar hold.

For the reasons cited above, SPG's claim of conversion is delinquent and Smith Defendants are entitled to judgment as a matter of law on this issue.[18]

### D. Count IV: Fraud by Misrepresentation or Omission

SPG claims that Smith Defendants committed fraud because, at the time Smith entered into the 2000 Agreement, he had "a present intent of future breach." DN 130, PageID# 1155. In Kentucky, fraudulent misrepresentation requires a showing that:

> (1) the defendant made a material representation to the plaintiff; (2) the representation was false; (3) the defendant knew the representation to be false or made it with reckless disregard for its truth or falsity; (4) the defendant intended to induce the plaintiff to act upon the misrepresentation; (5) the plaintiff reasonably relied upon the misrepresentation; and (6) the misrepresentation caused injury to the plaintiff.

*Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011) (citing *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009)). SPG has not met this standard in its allegation of fraud. The 2000 Agreement, and its subsequent iterations, were silent as to the fees

---

[18] Even assuming that SPG could meet elements two through six of the conversion claim, SPG does not specify the damage it purportedly suffered from the alleged conversion of its domain names, as is required under element 7.

that SPG could incur should SPG ask Smith to provide auth codes or lift the admin lock. As such, SPG has not offered evidence that Smith made "a material representation" about the fees in the 2000 Agreement.

SPG also cannot maintain a claim based on a theory of fraud by omission. To substantiate such a claim in Kentucky, "a plaintiff must prove: (1) the defendant had a duty to disclose the material fact at issue; (2) the defendant failed to disclose the fact; (3) the defendant's failure to disclose the material fact induced the plaintiff to act; and (4) the plaintiff suffered actual damages as a consequence." *Giddings & Lewis, Inc.*, 348 S.W.3d at 747 (quoting *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. Ct. App. 2003)).

SPG claims that "[Smith] Defendants *never* intended to let SPG out of its relationship without a fight." DN 130, PageID# 1155 (emphasis in original). However, SPG offers no proof of this allegation. Although the 2000 Agreement made no mention of the fees that SPG could be charged if Smith Defendants provided auth codes or lifted the admin lock, "mere silence is not fraudulent absent a duty to disclose." *Smith v. GMC*, 979 S.W.2d 127, 129 (Ky. Ct. App. 1998) (citing *Hall v. Carter*, Ky., 324 S.W.2d 410 (1959)). SPG does not argue or offer any evidence that Smith had a duty to disclose in the 2000 Agreement any and all fees that SPG could possibly ever incur. In fact, the evidence in the record suggests the opposite, as the parties revisited the terms of the 2000 Agreement each year to address the fees associated with additional domain name registrations and other services requested by SPG.

In sum, SPG has not shown that a genuine issue of material fact exists as to the claim of fraudulence against Smith Defendants.

### E. Count V: Negligent Misrepresentation

SPG maintains that Smith Defendants committed negligent misrepresentation by providing SPG with "false information." DN 130, PageID# 1157. As evidence of negligent misrepresentation, SPG cites:

1. "the contract between the parties did not specify any fees for termination or transfer, but [Smith] Defendants imposed substantial fees;"[19]

2. the auth codes "did not function as represented by [Smith] Defendants, and [Smith] Defendants knew [the auth codes] would not work due to their imposition of a separate lock on the names;"[20]

3. though Smith Defendants admit that their relationship with SPG is controlled by ICANN Transfer Policy, which "does not allow a registrar to refuse to permit the transfer of a domain name that is not in arrears," Smith Defendants defied this policy;[21] and

4. the BestRegistrar "website list[s] prices for domain names and state[s] '[n]o other fee will be charged to you.'"[22]

None of SPG's claims militate a finding of negligent misrepresentation. "The tort of 'negligent misrepresentation' requires a *misrepresentation*—an omission, or a subjective inference [the alleging party] may have drawn from a truthful representation, is not enough." *McAlpin v. Am. Gen. Life Ins. Co.*, 601 S.W.3d 188, 194 (Ky. Ct. App. 2020) (emphasis in original). Thus, the alleged omission of "fees for termination or transfer" from the 2000 Agreement does not advance this claim. Likewise, though SPG maintains that the auth codes "did not function as represented by [Smith] Defendants," SPG has not identified any "affirmative false statement" made by Smith

---

[19] DN 130, PageID# 1157.
[20] *Id.*
[21] *Id.*
[22] *Id.*

Defendants regarding the functionality of the auth codes.[23] Third, even if Smith Defendants' violated the ICANN Transfer Policy, this is not evidence that Smith Defendants falsely represented that they were bound by the policy. The evidence in the record shows that Smith Defendants were, in fact, bound by this policy. Finally, SPG inaccurately frames the statement on BestRegistrar's website, which reads, "No other fee will be charged to you by BestRegistrar.com *for the maintenance of your name*." DN 130-4, PageID# 1205 (emphasis added). The website does not provide any representation of the other fees or charges that a domain name owner could incur for services beyond "maintenance" of the domain name.

As SPG has failed to provide evidence to support an essential element of its negligent misrepresentation claim, Smith Defendants are entitled to summary judgment on this issue.[24]

### F. Count IX: Unjust Enrichment and Quantum Meruit

SPG urges that, "[f]or all of the reasons [it] has a viable claim for breach of contract, it also has a viable claim under the theories of unjust enrichment and quantum meruit." DN 130, PageID# 1157. The Court disagrees. To establish a claim of unjust enrichment or quantum meruit, SPG must evidence that it conferred a benefit upon or provided a valuable service for Smith Defendants at SPG's expense and that Smith Defendants appreciated and retained this benefit without

---

[23] Insofar as SPG argues that Smith Defendants informed SPG that the auth codes would allow SPG to transfer the domain name registration services, this also does not show that Smith Defendants negligently misrepresented the functionality of the auth codes. The existence of the registrar hold is wholly separate from the need for auth codes to effect a transfer. Thus, unless Smith Defendants told SPG that the auth codes would remove the registrar hold—a claim that SPG does not allege or evidence—the fact that the registrar hold prevented the transfer of the domain name registration services to a new registrar does not speak to whether the auth codes functioned as represented by Smith Defendants.

[24] The Court takes notice of SPG's argument that Smith Defendants have not met their burden of proof as the party moving for summary judgment. DN 130, PageID# 1156. However, Smith Defendants do not attempt to negate portions of the record but are trying to show that they are entitled to summary judgment due to "a complete failure of proof concerning an essential element" of SPG's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, (1986) (stating that summary judgment is appropriate when "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof"). It is, thus, nonsensical to demand that Smith Defendants point to "a portion of the record" to prove that there is no "portion of the record" that supports SPG's claim.

compensating SPG. *See Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009) (citation omitted); *Quadrille Bus. Sys. v. Ky. Cattlemen's Ass'n*, 242 S.W.3d 359, 366 (Ky. Ct. App. 2007) (citation omitted).

SPG does not offer evidence to support either of these equitable claims. SPG has not shown that it paid for any services that Smith Defendants did not render. SPG's perception that "SPG's expenses increased" at a rate that was "disproportionate to the number of domains [SPG] owned"[25] does not show that SPG provided some "uncompensated" benefit to Smith Defendants. Smith Defendants provided the services that SPG paid for—that SPG felt the cost was excessive does not suggest inequity.

SPG also submits that it is entitled to an equitable resolution based on Smith Defendants' violation of ICANN policy, but the out-of-circuit case SPG cites for support actually undermines this argument. In *Register.com, Inc. v. Verio, Inc.*, the Second Circuit found that, for Verio to be able to recover based on an agreement between ICANN and Register.com, Verio would have had to show that the agreement "was made for [Verio's] benefit." 356 F.3d 393, 399-400 (2d Cir. 2004). Because Verio failed to make such a showing, the court denied any relief to Verio under this theory. *Id.* at 400. Similarly, SPG has neither argued nor evidenced that it is entitled to equitable relief based on the agreement between ICANN and Smith Defendants.

In sum, the Court finds that Smith Defendants have shown that there are no genuine issues of material fact as to whether SPG is entitled to equitable relief.

## VII.   Conclusion

Based on the findings discussed above, the Court will grant both motions for summary judgment in a separate order.

---

[25] DN 130, PageID# 1157.

31

March 14, 2022

Charles R. Simpson III, Senior Judge
United States District Court

32